Thank you. Good morning, Your Honors. My name is Matthew Schultz. I'm here on behalf of the appellant, Thomas Ross. I'd like to reserve four minutes for my rebuttal, please. That is fine, and you may proceed. Your Honors, this case really turns on the prosecutorial misconduct. Not only the misconduct that took place during the rebuttal closing argument during the trial, but the misconduct that took place throughout the course of the case. The district court held that portions of misconduct that Mr. Ross cited to in his brief, other than those that took place during the closing argument, were procedurally defaulted. But I'd like to discuss the other issues as well. One of our assignments of error is that the district court misapplied the procedural default standard. With regard to the closing argument itself, this case bears a remarkable resemblance to a case this court decided a few years back called Hodge v. Hurley. That case actually based the reversal on ineffective assistance of counsel. It was actually a higher standard than we're dealing with here. That case also dealt with allegations of sexual abuse of a child. It also dealt with comments by the prosecution on the credibility of the witnesses during closing argument. It also dealt with misstatements of the evidentiary standards during closing argument. It also dealt with misrepresenting the nature of the expert testimony during closing argument, attacks on the defendant's character, and asking the jury to put themselves in the place of the parties involved. The most egregious example of prosecutorial misconduct during the rebuttal closing argument that the state made, the rebuttal was actually longer than their original closing argument. And of course, this was at the point where Mr. Ross's counsel didn't have a chance to respond to any of these arguments at being rebuttal. But the most egregious example was the prosecutor asked the jury to put themselves in the place of a parent with two children, one of whom is being bullied. She asked them to do it not in the context of convicting the defendant, but in the context of using their common sense about whether you would question further. Yes, Your Honor, but it's still an emotional appeal. It's asking the jury to make an emotional decision about how to treat their own children. Regardless of the way it's put, it casts Mr. Ross in the role of the bully and the jury in the role of the parents of these children who are making these allegations. Regardless of the way it's put, it's still an emotional appeal. It's the sort of thing that's barred during closing argument. You can't ask the jury to decide the case on their emotions. They have to decide it on the evidence. The prosecutor also vouched for the veracity of her own witnesses. She said straight out, these kids are telling the truth. She accused Mr. Ross' counsel of intentionally confusing the children. She said something to the effect of she's not surprised that an attorney with 30 years of experience was able to confuse a couple of kids. She accused Mr. Ross of giving coach testimony. She said that Mr. Ross wasn't able to answer a question until he went outside in the hall and talked to his attorney. She accused Mr. Ross of leading a lifestyle that showed he was a child abuser. There's no connection between child abuse and any sort of lifestyle that was ever made to the jury. Was that objected to? I don't have that in front of me, Your Honor. I believe it was. She did say, she said to the jury, you're here to judge his wrongdoing. Those are her words. That's again a misstatement of the jury's role. Let me ask you, maybe to put this case in context. This case is before us under Habeas Corpus Appeal. So what is the governing standard by which we analyze this case? My understanding is there has to be a showing that the state court unreasonably applied, clearly established federal law as a Sixth Circuit case from the mid-2000s. But do we really look at Darden or Parker in terms of... It's Darden, Your Honor. Darden set the standard for Habeas Corpus Appeal based on prosecutorial misconduct. The standard that the Supreme Court handed down was that the prosecutor's comments must so infect the trial with unfairness as to make the resulting conviction a denial of due process. So that's what you need to show. And that's the standard that the Hodge Court applied, Your Honor. This case is immensely similar. If those same, that's very similar set of facts met the Darden standard in Hodge, it should also meet that standard here. And that requires reversal. One of the instances of prosecutorial misconduct that we weren't allowed or that the district court decided was procedurally defaulted was the comments that the prosecutor made during closing argument about the testimony of the experts, both the defendant's expert and the prosecution's expert. Regarding the defendant's expert, Dr. Saul Falero, the prosecutor said he did not say these kids are lying. I'm sure Your Honors are familiar with the Ohio State case, State v. Boston, specifically says that in a prosecution for child abuse, an expert is not allowed to state whether or not the accusers are lying. They're not allowed to offer an opinion on that. The prosecutor said he didn't say they were lying. He's not allowed to say they're lying. She's bringing up an issue trying to cast doubt on Dr. Falero's testimony because he didn't do something he wasn't allowed to do. With regard to the prosecution's expert, Dr. Maselli, the prosecution's expert I'm sorry, actually regarding Dr. Falero again, the prosecutor said he doesn't know this child. He's never met any of them. Mr. Ross' counsel actually asked the court for permission for another expert, Dr. Peterson, to interview the children and at the prosecution's insistence that request was denied. Dr. Peterson would have interviewed the children and testified as to the results of that interview. He wasn't allowed to. So the prosecution attacks Dr. Peterson. So Peterson had met them? No, he was not allowed to interview them, Your Honor. The trial court wouldn't allow it. I don't understand the difference. What if the court had allowed Peterson? Then Dr. Peterson would have been able to testify and the prosecution wouldn't have been able to say their experts don't know these children. Well, you're telling me then that Dr. Peterson had met them? No, Your Honor. He wasn't permitted to. Because of that, the prosecution was able to say their experts don't know these children. The prosecution is taking advantage of a situation they created by preventing Mr. Ross' experts from actually interviewing the children. Oh, Peterson was the expert. He was one of the experts that we named. But he wasn't actually allowed to testify because he never got to interview the children. We had named him as an expert to interview the children. Dr. Peterson's an expert on sexual abuse. He deals with a lot of retired veterans at the VA in Dayton. He would have interviewed the children and been able to say whether their stories are consistent with stories given by children of sexual abuse. He wasn't allowed to do that. The trial court forbade it. And the prosecution took advantage of that during closing argument by saying their experts don't even know these kids. With regard to the prosecution's expert, Dr. Maselli, the prosecutor misstated her testimony. The prosecutor claimed that Dr. Maselli said false allegations are very rare. What Dr. Maselli actually said was that false accusations don't come to light very often. She said pretty infrequently. The prosecutor also made one final appeal to a motion by telling the jury they didn't have to punish the kids because of how the adults around them behaved. Another of the issues that the district court decided was procedurally defaulted was the leading questions that the prosecution used during the trial itself. I'd like to just ask a question. Yes, Your Honor. Did the COA include these rulings on defaulted issues? No, I don't believe it did, Your Honor. How do we deal with that? I've been struggling with this issue myself. I wasn't able to find any research on it. It seems to me that this court has jurisdiction to review the decision on the certificate of appealability made by the district court. I can't imagine any other way that that could be challenged other than in this court. But usually you ask, you raise it, and then you get a COA on it. Yes, Your Honor. I don't believe that the procedural default issue was raised in our motion for the certificate of appealability. I'd have to go back and check, and I'm not sure. The next issue, the leading questions. Leading questions. When Ross's counsel objected, it didn't do the trick. The trial court repeatedly instructed the prosecution to avoid the leading questions and was repeatedly ignored. The trial court didn't do anything about it. For instance, the prosecution was examining one of the complaining witnesses who's identified as BB. The prosecutor asked him, when you said that the defendant would start touching you, counsel objected. That was sustained. So then the prosecution asked, what would happen when you and the defendant were watching the movie? The boy answered, he would touch me. In another instance, the prosecution asked, did anyone ever tell you not to tell on the defendant? The boy answered, no. A little bit later, the prosecution asked, did this defendant tell you not to tell? There was an objection. It was overruled. The boy answered, no. A little bit later, a similar question. Were you told not to tell about the drugs or the sex acts? A little bit more specific. The boy answered, no. There was an objection. It was overruled. Then, did the defendant ever tell you not to tell on him about the drugs? There was an objection that was overruled. The boy answered, yes. Then did you tell him not to tell about the pornography? The boy answered, no. Again, another objection that was overruled. Did the defendant ever tell you not to tell on him about the sex act? Finally, the boy answers, yes. The prosecution finally, on the sixth question, got the answer it wanted and stopped. This is a great example of the leading questions, the way the prosecution led these boys to testify. Even after having prepared them for the trial, the prosecution still used the leading questions during the trial. Over-objection, after being instructed not to use them. Mr. Schultz, your time has expired. Thank you, Your Honor. May it please the Court, I am Hilda Rosenberg. I am representing the Warden. There are only two issues that are properly before this Court. The first is prosecutorial misconduct based on allegations which have not been procedurally defaulted. The second is a Brady issue with respect to the grand jury testimony. Contrary to petitioner's claim, a certificate of appealability is required on procedural rulings based on procedural defaults. They did not seek a COA on any of the procedurally defaulted grounds in the District Court. While they claim it was unnecessary, the Supreme Court disagrees. In the case of Slack v. McDaniel, the Supreme Court indicated that the right to appeal is governed by certificate of appealability requirements. And they explained how one seeks a COA on a procedural ruling. The Court said when the District Court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue and an appeal of the District Court's order may be taken if the prisoner shows at least that jurors of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurors of reason would find it debatable whether the District Court was correct in its procedural ruling. The District Court in this case specifically limited the certificate of appealability to non-defaulted prosecutorial misconduct claims and to a Brady issue with respect to the grand jury testimony. If the petitioner was dissatisfied with that certificate of appealability, he was free to ask this Court for an expansion of the certificate of appealability to include the defaulted claims. He did not do so. Turning first to the prosecutorial misconduct claims, the proper standard here is the Darden Fundamental Fairness Test. Were the comments so pervasive, so egregious that they amounted to a denial of a fundamentally fair trial and therefore constituted a due process violation? The correct standard is not Hodge. In fact, it would be error for this Court to base its determination on the Hodge case and the Supreme Court has specifically criticized this Court in the Parker case for making these types of comparisons with prior circuit court precedent. The Court in Parker stated, referring to this Court, and it stated that the prosecutor's comments in this case were sufficiently similar to certain comments held unconstitutional in its prior decision in Gall 2, that they rise to the level of impropriety. The Court went on to say, as we explained in correcting an identical error by the Sixth Circuit two terms ago, they cite the Renico case, circuit precedent does not constitute clearly established federal law as determined by the Supreme Court. It therefore cannot form the basis for habeas relief under the AUDPA. The Supreme Court specifically said that that kind of comparative analysis was improper, that in deciding whether there is a prosecutorial misconduct claim under AEDPA, the Court has to look at Darden and Darden is very instructive on this point. Many of the circumstances that were present in Darden are also present in this case and one of them is the provocation by defense counsel in their closing argument. The Court in Darden determined that this was one of the bases on which it decided that there was not prosecutorial misconduct in Darden's case. Like in Darden, in our case, the defense counsel had a closing argument that was very inflammatory, that relied on evidence outside the record, compared the case to the Richard Jewell case where an individual was falsely accused of terrorist activities, compared the Ross case to the Salem witch trials where children made false accusations. He further accused the children of being coached at least five different times during his closing argument when there was no evidence of coaching. In fact, the children were asked specifically, one of the children, Bebe, was asked, you know, how many times did you meet with the prosecutor? When did you meet? And he said, I met one time immediately before trial and that was the only information on the record. So there was no evidence of coaching yet. He made that accusation several times. Well, he could have been coached by any number of people. That's true, but there was still no evidence of coaching. And that was one of the things that the prosecutor was responding to in her comments. One of the other issues was in Darden that the court looked at was the presence of a jury instruction. That was very important in that case. There was an instruction that argument is not evidence. And the same instruction was present in Ross's case. In fact, the judge instructed the jury to that effect at least twice during his general jury instructions and then once during the argument. The prosecutor also emphasized that point in her argument, including in her rebuttal. And in addition, the judge instructed the jury that they were the sole people who would determine the credibility of the witnesses. And so that, just like in Darden, there was the same type of jury instruction present in the Ross case. There are times though when a jury instruction is not sufficient, right? I mean, it's not curative. If the conduct of the prosecutor is so egregious, so, so bad that it's determined that really an instruction will not be sufficient. That does happen. Well, I would say two things to that, if I could. One, there's precedent to the effect that the jury is presumed to follow the instructions of the court unless it's, it's, that there is information that shows that they cannot. And the second thing is that this was not a case like that. This was not a case with egregious comments. For one thing, many of the issues that Mr. Ross's counsel presented as examples of prosecutorial misconduct were procedurally defaulted. The leading questions issue, misinterpretation of the state's expert witness, those two things were procedurally defaulted and should not be considered. But in any event, most of the comments were direct responses to the provocation by the defense counsel. And, and also another point that is very important is that Ross's counsel said there was no opportunity for him to rebut these comments, but there certainly was an opportunity to object. And for the most part, he didn't. So some of the comments that he went over were the so-called golden rule violation where you're not allowed to put yourself in the shoes, you're not allowed to say, please put yourself in the shoes of the litigant. And, um, both the district court and the court of appeals, um, viewed the actual comment made by the prosecutor as an appeal to their common sense. Um, the, the, um, district court said this was a completely proper appeal to the juror's common sense about how to interpret a report from a child as opposed to asking them to emotionally identify with parents of abused children. Um, so basically what the prosecutor was saying is if a child came to you and reported something was wrong and then you had another child who just wouldn't, just wouldn't say anything. I mean, they just were so upset. And then when they were told, but my first child said something, they started crying. Wouldn't you have an obligation to follow up and ask them what happened? Um, this example was given by the prosecutor because the detective followed that same type of questioning. The one of the youngest, youngest children in this was a little boy by the name of Dustin. He was 10 years old when he testified and these acts occurred when he was much younger and he wouldn't be forthcoming initially. So the detective had to prod him a little bit. And because of that, the defense accused, um, the detective of being suggestive. And this comment was a direct response to that accusation. Um, these were the circumstances that he was dealing with. The detective was dealing with a child who, you know, for very good reason, um, was not being forthcoming. He was embarrassed. It was, he was young and that is why that example was given. Again, it's an appeal to the jurors common sense, their reason, not their emotion. And that is what both courts found. Um, the, the comment, uh, the vouching comment that for the victim that, that the prosecutor made was tied into the evidence, um, at trial. She basically said the reason that they're telling the truth is because look at how they withstood the cross-examination. They were, they were subject to hours of cross-examination. Uh, I counted the pages for the, for one of the children and, um, BB and it was over 200 pages of cross-examination and the transcript. And, and she said, she said they withstood that cross-examination and that is why they are truthful. Again, no objection was made. And again, it was a response to the multiple claims that the witnesses were vouched, vouching, um, made by the defense counsel. The comment that the, um, defense expert did not say that the victims lied, um, when it is not permitted under Ohio law. The Ohio court looked at that and said, um, that did not even find that improper. They said, maybe it's arguably improper, but we have to give the prosecution some latitude in responding to, um, the closing argument. And, um, the reason that they said that was because she was saying, where is the evidence of coaching? Did the experts say they were coached? That's the context that the comment was made in. And it was a direct response to, um, the defense's argument. Again, no objection was made, um, by the, um, defense counsel. The comment, don't punish the kids for the suggestive questions or mistakes, in the record. Um, again, no objection was made to that. And the Ohio court of appeals stated, quote, it was not an emotional appeal for a juror to convict Ross for the benefit of the children. Again, that has to be viewed in the context in which it was made. She was saying, um, don't convict because you think we maybe, we didn't ask the children the questions in the right way. This went back to the whole issue of, were they too suggestive when they interrogated or examined, um, the, the, uh, children. And, uh, the comment about mistake in the records, well, there was a mistake in the record. And so she's saying, does that mean that, that we shouldn't, uh, convict, uh, Ross? Um, the comment on the misinterpretation of the state's, um, expert regarding false allegations of abuse, um, that comment was procedurally defaulted, should not be considered. In any event, if you look at what the expert testified to, um. Is this Dr. Peterson that you're referring to? No, this is the state's expert, Dr. Maselli. And they said that, um, she, uh, the, the petitioner's claim is that she, the prosecutor misrepresented the evidence on that point. And if you look at what Dr. Maselli said, um, it's, it's, first of all, it's very open to interpretation. I would completely disagree with their interpretation. She was asked two questions, um, and, uh, she did say that false allegations are rare. And she also said that they are not commonly discovered. So I, I would completely disagree with what she said. And, and even the court of appeals said any consistency, said if there is a consistency, if any. So even the court of appeals wasn't sure that there was an actual inconsistency. Just, uh, just out of curiosity, what was the reason for not letting Dr. Peterson testify? Oh, actually what they wanted to do was they wanted to have him conduct a psychological evaluation of the children. And the Ohio court of appeals determined that under Ohio law, that was not allowed, that it was considering, considered damaging to conduct a psychological examination of these children, um, by a, uh, defense expert. And it wasn't that they weren't allowed to talk to the children. That wasn't the point. The point was that they weren't allowed to conduct a psychological evaluation. And that's what they had requested. And in fact, they, they sent out, meaning the defense sent out an investigator who did talk to these children. So they had all that information, but the court specifically, um, refused to allow a psychological evaluation. And, and, and, and there is, um, they talked about how, um, you could not, you had to be very careful with children who were victims of sexual abuse, how many times you examine them. I see my time is up. Um, a question about the grand jury testimony. Yes. I mean, there's some indication that there, the part about the anal sex didn't come out of the air. So there's some indication that there were comments about it and how are they supposed to know if how, whether they were prejudiced, if no one has looked at it for, for a Brady violation, there are three things you have to show. Um, and one is that the evidence was suppressed. Two is that the evidence was exculpatory or impeaching and three that it was material. Um, so for the second, I'm going to jump to the second one, even though I, I don't think any of these were met, but on the second one, was it impeaching? Um, through the testimony, um, in court, um, it was determined that with respect to Brandon, the issue of the anal sex came from a concern that was registered by his mother with the caseworker when, when, uh, when he initially disclosed, she, um, took him to care house. He was interviewed at care house and the mother, um, was the one who mentioned anal sex. Now she, um, there was a transcript of her testimony that was put into evidence and as part of the record, she was interviewed by phone and the parties had an opportunity to examine her during this by phone. Um, she was very direct in saying that this was my concern, not my son's. And she also said that Brandon denied it. She questioned him about it and he denied it. Now with respect to Dustin, um, that was, um, that, that out, the allegation of anal sex stemmed from an admitted mistake of the caseworker. She had put in her, in her referral, um, letter, uh, referring Dustin for counseling, that there was the possibility of anal penetration. And, um, when she was confronted with that, um, on the stand, she said she made a mistake. She said that neither one of the boys in the interviews alleged anal sex and she was part of the interviewing process. So she conceded that was a mistake and, um, and it did, it stemmed from, uh, a, um, it was in the bill of particulars where it said either oral sex or anal sex. And there was or in, in that bill of particulars. So it wasn't necessarily anal sex, but that was in the bill of particulars. That's where the, um, the, um, defense, um, had got the idea that that might be a possible possibility that there was an inconsistent statement. Um, and, um, that was shown not to be the case through the testimony. And in terms of the final requirement of Brady for materiality to fully answer your question, um, this was, this was not material because, um, there was no reasonable probability that it would change the outcome of the case. Um, the reason it's not material is there's two reasons. One, it was cumulative in the sense that there were other inconsistencies, many inconsistencies in the children, the child victim's testimony that would, that came out both internal inconsistencies and inconsistencies with other witnesses. And this court has held that, um, when, when the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack, the undisclosed evidence may be cumulative and hence not material. And that's Byrd versus Collins. The other reason that it's not material is to some extent a substantial equivalent of that evidence was available. And, um, by that I mean that the, um, defense had access to the transcripts of the examinations conducted by care house of the victim witnesses. And they, they were given these transcripts, they were used for cross-examination purposes throughout the forensic interview with the detective. And as I stated earlier in, in addressing, um, your question, judge, um, they also had an investigator's report. They sent the, their own investigator out to talk to these witnesses. Well, wouldn't it have been, I mean, let's say there had been testimony at the grand jury about it. I mean, counsel would have been very, could have used that very, very much that they don't say anything about it here. They don't say anything about it here, but look, prosecutor was able to get them to say whatever he wanted them to say at the, at the grand jury. So why couldn't you at least have the prosecutor's representation that there was no such testimony as an officer of the court or, I mean, why, why was it just completely eliminated? Um, well, what the court of appeals said was that they, that the trial judge did not provide the testimony, the grand jury testimony, because they, he could reasonably find that there was a slim chance that it contained any of those allegations based on the testimony that came out at trial. And moreover, the court of appeals felt that, um, that it was completely speculative and that under these kinds of circumstances, anyone could just say, you know, there's maybe an inconsistency in the grand jury testimony. Can I have it please? Well, but that's not anybody saying maybe there is, there's somebody pointing to something that appears to be there, this alternative charge, something in the notes. I mean, you're basically saying, no, you have to take their explanation for where it came from. Well, the, I would say two things. First, that the court decided under state law that there was no particularized need that outweighed the need for secrecy. Um, that is a matter of state law. It's not a constitutional issue. And, um, this court is under habeas, on habeas review is, is bound by the state court's determination. But it's still a Brady issue, isn't it? Um, it's, it, the Brady part of it comes into play with, um, not so much in any in-camera review because that is not a Brady issue. That is a matter of state law, whether an in-camera review is, is going to, um, be conducted. But ultimately the question is whether they should have gotten this information. And with regard to that, they've always argued that it's a Brady issue and a due process issue, haven't they? Yes. But as, as I hope I've laid out, um, they didn't meet the requirements for Brady in that they weren't able to show that it was impeaching and they weren't able to show that it was material under, um, the definitions of materiality in this court. Um, and I wanted to ask you, um, about the Ohio grand jury process, cause there's nothing about it in the record. Uh, do, are the victims required to come before the grand jury and proof in the record that these children never showed up in front of the grand jury? And are there transcripts of their testimony? I, I believe that there are. Do they take transcripts in the Ohio grand juries? I, I would, I, I guess I would believe that there are, but I, I can't answer for certain. The reason I believe that there are is I, I can't imagine that this would have been such an issue if there weren't any. Well, you know, everything differs from state to state and what would have happened in Tennessee with regard to this case is a police officer who was in charge of the investigation would have shown up before the grand jury and would have testified as to what the investigation showed. There would have been no prosecutor in there. There would have been no court reporter in there. There would have been minutes in a, in a journal of what the grand jury did in response to the charges and that's it. So I was just interested to know whether that the procedure in Ohio was so different that actually there may have been an issue here of, of available transcripts. Well, my best recollection is that the children did testify. And I, I honestly do not know for certain whether there were actual transcripts that were made. Okay. Well, thank you, Ms. Roosevelt. Thank you. Thanks. To answer your question, Your Honor, I, well, Montgomery County, where this trial was held, uses a video transcript system. I believe they use the same thing for the grand jury testimony. So there's probably not a written transcript, but I believe there's a video. You should have gotten hold of the videos. Correct, Your Honor. And Judge White, I think you made my point for me on that. There was at least enough of a question that even under Ohio law, much less under federal law under Brady, there should have at least been an in-camera inspection of that video or transcript if there's one prepared in order to determine whether or not these, there was actual impeachable information. And was there that request? Yes, Your Honor. We did request that the trial court did not refused. And did you, did you ever ask that another court view it or grant leave for you to view it or have some sort of a hearing or anything on it? We brought up the issue in the Court of Appeals and I believe also in the Ohio Supreme Court. There wasn't really a procedure that would allow the Court of Appeals to view it. The record's pretty much set at the time we filed the Notice of Appeal. And there's really, I don't know of a way to augment it. Procedure to remand, requesting? I don't know that there's a procedure like that, Your Honor. And with regard to the Supreme Court, we were restricted to a 15-page memorandum in support of jurisdiction. They didn't even accept the case, which is why we filed the habeas corpus petition. Regarding that specific issue, Bibi's mother's testimony over the telephone, because she had actually left the state in order to not be compelled to testify, actually stated, and I had the page, here it is. She testified by telephone that Bibi himself had made the When Mr. Ross' counsel asked to be... You're saying that what counsel said isn't true? I believe she just got the fact incorrect, Your Honor. I believe she just got the fact incorrect, Your Honor. I looked at that page yesterday when I was preparing. It was the big difference between saying it was my concern, he never said it, I was just concerned, and no, he told me... His mother bounced around a lot, Your Honor. At one point she did say he had made this report, that's why I brought it up. Based on that fact, Mr. Ross' counsel asked to recall Bibi in order to impeach him with his testimony, and they were denied the chance to do that. It's the same thing that they would have used the grand jury testimony for if they had been able to get a hold of it. So what's the page number again where... Page number, it's in our brief, it's page ID number 2733. And she testifies that Bibi... She said that he brought it up himself, and so she brought it up during the interview. He had brought it up to her. And he brought up that he had been anally... That there was some sort of anal-penile contact. Okay. With regard to the appeals to a motion, at the end of that long conversation about investigating bullying, the prosecutor quoted Alice Walker, saying that the most important question is why is the child crying? That's not an appeal to common sense, Your Honor, that's an appeal to a motion. With regard to there being evidence of coaching, I read it to you when I was up here before, that those leading questions are evidence of coaching while they're on the stand. The Darden court said that improper comments have to be put in context. The court has to look at the cumulative effect of all of this misconduct and the effect that it has on the jury. And that's what we'd ask the court to do. And I see I'm out of time. Thank you very much. Okay. Thank you, Mr. Schultz. And Ms. Rosenberg, we appreciate your arguments. The case will be submitted, and you may call the next case.